Approved: __Andrea M. Griswold__  **16 MAG 8134**
ANDREA M. GRISWOLD
Assistant United States Attorney

Before: HONORABLE RONALD L. ELLIS
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - x
                                    :   SEALED COMPLAINT
UNITED STATES OF AMERICA            :
                                    :   Violations of
           - v. -                   :   7 U.S.C. §§ 6b(a)(2),
                                    :   13(a)(1) and 13(a)(5);
PEDRO JARAMILLO,                    :   18 U.S.C. §§ 1343, 1957 &
    a/k/a "Enrique Jaramillo,"      :   2.
                                    :
           Defendant.               :   COUNTY OF OFFENSE:
                                    :   NEW YORK
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

ALEXANDER H. KURGANKSY, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI") and charges as follows:

## COUNT ONE
### (Commodities Fraud)

1. From at least in or about January 2014 through in or about December 2016, in the Southern District of New York and elsewhere, PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, willfully and knowingly, in connection with an order to make and the making of a contract of sale of a commodity for future delivery, made and to be made for and on behalf of and with another person, directly and indirectly: (a) cheated and defrauded another person, and attempted to do so; (b) made and caused to be made to another person a false report and statement and entered and caused to be entered for another person any false record; and (c) deceived another person, and attempted to do so, by any means in regard to an order and contract and the disposition and execution of an order and contract, and in regard to an act of agency performed, with respect to an order and contract for and with the other person to wit, JARAMILLO solicited more than $1.2 million in funds from investors purportedly for the purpose of trading in commodity futures contracts, when, in truth and in fact, JARAMILLO instead

converted the majority of investors' money to his own use, used some of the money to pay purported returns to other investors to whom he falsely reported positive investment results and account balances, and wired some of the money from accounts in the United States to offshore bank accounts.

(Title 7, United States Code, Sections 6b(a)(2) and 13(a)(1)and (a)(5); Title 18, United States Code, Section 2.)

## COUNT TWO
## (Wire Fraud)

2.     From at least in or about January 2014 through in or about December 2016, PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, in the Southern District of New York and elsewhere, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, JARAMILLO solicited more than $1.2 million in funds from investors purportedly for investments in commodity futures contracts, and other investments, when, in truth and in fact, he converted the majority of investors' money to his own use, used some of the money to pay purported returns to other investors to whom he falsely reported positive investment results and account balances via email and other interstate wires, and wired some of the money from accounts in the United States to offshore bank accounts.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
## (Money Laundering - International Monetary Transactions Involving Crime Proceeds)

3.     In or about December 2015, in the Southern District of New York and elsewhere, PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, a United States person, knowingly, within the United States, in an offense involving and affecting interstate and foreign commerce, did engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, JARAMILLO transferred the proceeds of the wire fraud offense charged in Count Two of this Complaint to investments

not available to the general public, in transactions affecting interstate commerce, and through the use of wires greater than $10,000 from bank accounts at U.S. financial institutions to bank accounts at foreign financial institutions, including a wire transfer on or about December 7, 2015, in the amount of $25,000 from an account at a financial institution in New York, New York controlled by JARAMILLO to an account at a financial institution in Peru.

(Title 18, United States Code, Sections 1957 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4. I have been a Special Agent with the FBI for approximately seven years. I am currently assigned to a squad that is responsible for investigating violations of the federal securities and commodities laws, as well as wire, bank, and mail fraud laws and related offenses, including money laundering. I have participated in numerous investigations of these offenses, and I have made and participated in making arrests of numerous individuals for committing such offenses.

5. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including documents and information provided to me by others, including victim investors. Because this affidavit is prepared for limited purposes, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part. Where dates, figures, and calculations are set forth herein, they are approximate.

## Background

### The Defendant and Relevant Entities

6. Based on interviews I have conducted of victim investors, my review of documents provided by victim investors, my review of electronic communications between PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, and others, and my review of bank account records for certain accounts affiliated with JARAMILLO and entities and aliases used by JARAMILLO, I have learned, among other things, the following:

    a. At all times relevant to this Complaint, JARAMILLO, a Peruvian national residing in New York, New York, was a self-described investment professional with a focus on international investments, including commodities.

    b. At various relevant times, JARAMILLO purported to be affiliated with at least six different investment entities (the "Jaramillo Entities").

    c. At all times relevant to this Complaint, JARAMILO maintained an office located in the Trump Building located at 40 Wall Street in Manhattan, New York (the "Wall Street Building").

    d. At all times relevant to this Complaint, JARAMILLO represented to investors and prospective investors that he had an established relationship with a certain well-known international investment bank based in Switzerland (the "Global Investment Bank") through which JARAMILLO was able to access investment and other opportunities for his clients.

    e. At all times relevant to this Complaint, JARAMILLO maintained and controlled at least four bank accounts (the "Jaramillo Accounts") at a U.S. bank headquartered in Manhattan, New York (the "U.S. Bank").

### Relevant Statutory and Regulatory Background

  7. The U.S. Commodity Futures Trading Commission (the "CFTC") is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodity Exchange Act, 7 U.S.C. § 1 et seq.

  8. Contracts of sale of a commodity for future delivery are governed by the provisions of the Commodity Exchange Act. In addition, any person who advises and manages the trading of commodity futures for compensation and profit acts as a commodity trading advisor, as defined under Title 7, United States Code, Section 1(a)(12).

### Overview of the Scheme to Defraud

  9. Beginning in at least January 2014 through in or about December 2016, PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, solicited more than $1.2 million in investments from more than two dozen investors, primarily for the purported purpose of investing in commodity futures contracts, by falsely representing, orally and in writing, that investor monies would be invested in short-term commodities contracts with a guaranteed

4

rate of return. In truth and in fact, JARAMILLO utterly failed to invest investor monies as promised. Instead, of the more than $1.2 million in investor funds, JARAMILLO converted more than $700,000 to his own use in the form of cash withdrawals and debit card purchases used to fund his lifestyle, including thousands of dollars on three vacations to Disney World for JARAMILLO, family and guests.

10. To hide his misappropriations and continue to fund his personal lifestyle, PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, also used new investor funds to pay back other investors in a Ponzi-like fashion. In total, since January 2014, JARAMILLO distributed more than $200,000 back to investors from funds deposited by new investors. During that time, JARAMILLO also diverted more than $100,000 of investor funds out of bank accounts he controlled in the United States to foreign bank accounts, including in Peru where JARAMILLO is a citizen.

### The YOUTUBE.COM Video

11. Based on my review of a youtube.com video (the "Video") featuring PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, and from speaking with victim investors who have viewed the Video, I have learned, among other things, the following:

    a. The Video, which is set to the soundtrack of Frank Sinatra's "New York, New York," features a series of images of Wall Street, the New York Stock Exchange, and JARAMILLO in front of the Wall Street Building. In the video, JARAMILLO uses the alias "Enrique Jaramillo."

    b. After flashing images of Wall Street, the Wall Street Building and the New York Stock Exchange, JARAMILLO made the following pitch to prospective investors, in substance and in part:[1]

> Why do you think the large companies and financial institutions invest in Wall Street? It is the heart of capitalism at a worldwide level. And I want to introduce you to it. Let me ask you something. Do you honestly believe that no one is making money in the

---

[1] Jaramillo speaks Spanish in the Video. The information contained herein is based on summary translations created by a Spanish-speaking linguist employed by the FBI. Investor-3, described below, confirmed that the individual in the Video is the individual known to Investor-3 as Pedro Jaramillo.

5

stock market?  Money is being earned on every transaction.  All you have to do is work with a person who is a proven winner.  That is why I am inviting you to invest with us.  I want you to understand something.  My clients view me as a trusted partner.  They call to ask my opinion before any investment in the stock market or outside the stock market.  The trust they have in me began with the initial transaction.  I want your vote of confidence to begin this mutually beneficial relationship . . . .  It is Enrique Jaramillo, stockbroker from Wall Street, New York, world capital of investment.

        c.  Following this introduction, JARAMAILLO made certain representations in the Video about specific protections afforded to prospective investors, including:

           i.  Investor funds would be maintained in individualized client accounts maintained at a separate custodial bank "under you name and your own account number."

           ii.  Client investments would be protected by the Securities Investor Protection Corporation, which would, according to JARAMILLO, provide "$250,000 of coverage, including up to $100,000 in cash claims."

           iii.  Such safeguards would ensure that prospective investors would "be protected against fraud and brokerage failure."

        d.  In truth and in fact, as described below, JARAMILLO not only failed to create individual investment accounts, he failed to use investor funds to make any legitimate investments, instead diverting the majority of funds to his own use, out of the country, or to repay earlier investors whose redemptions requests could not be forestalled.

### Victim Investors

12.  Based on my interview of victim investors ("the Victim Investors") of PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, and a review of documents provided by the Victim Investors, including contracts and electronic communications between the Victim Investors, JARAMILLO, and others, I have learned the following:

6

### Victim Investors-1 and -2

a. Victim Investor-1 is a fifty-six-year-old dual citizen of the United States and Peru who works as a medical professional. Victim Investor-1 is married to Victim Investor-2, also a dual citizen. Together, the couple have five children.

b. Prior to meeting JARAMILLO, Victim Investor-1 and his wife collectively maintained approximately $110,000 in savings, including their retirement accounts.

c. In or about 2014, Victim Investor-1 was introduced to JARAMILLO through a Peruvian national not named herein ("Individual-1"). Individual-1 told Investor-1 that JARAMILLO was a successful commodities investor with an office on Wall Street.

d. In or about December 2014, Victim Investor-1 and -2 met with JARAMILLO, along with Individual-1, in JARAMILLO's office at the Wall Street Building. During that meeting, JARAMILLO made the following representations, among others:

   i. JARAMILLO stated that he invested in commodity futures contracts, including contracts for produce futures.

   ii. JARAMILLO guaranteed that the investment would earn a twenty-five percent return in ninety days and that JARAMILLO would retain just two percent of the principal invested to cover fees and expenses.

   iii. JARAMILLO told Investor-1 and -2 that he required a minimum investment of $25,000. JARAMILLO then touted his relationship with the Global Investment Bank, explaining that if Investor-1 and -2 grew their investment to $300,000, the Global Investment Bank would open an individually managed account, which would entitle the couple to a line of credit for eighty percent of the value of the account.

e. At the end of the meeting, Victim Investor-1 gave JARAMILLO a check for $25,000 and signed an investment contract which stated that the funds would be invested in commodities and generate a twenty-five percent return in ninety days.

f. Over the next several months, JARAMILLO reported, orally and in writing, that the couple's investment was doing well and encouraged them to increase their investment. Between February 2015 and November 2015, the couple invested an additional $70,000 from their retirement accounts.

g. On a series of occasions in 2016, Victim Investor-1 and -2 made repeated redemption requests to JARAMILLO. In response, JARAMILLO returned only a small fraction of the couple's investments and blamed the Global Investment Bank.

h. In or about November 2016, JARAMILLO stopped responding to any communications from Victim Investor-1 or -2.

### Victim Investor-3

a. Victim Investor-3 is a real estate professional from Chile who currently resides in Long Island, New York.

b. In or about 2014, Victim Investor-3 learned about JARAMILLO through Individual-2, also a real estate professional ("Individual-2"), who told Victim Investor-3 that JARAMILLO ran a successful international hedge fund that was federally insured.

c. In or about December 2014, Victim Investor-3, JARAMILLO and Individual-2 met at JARAMILLO's office in the Wall Street Building. As with Victim Investor-1 and -2, JARAMILLO stated that he invested in commodity futures contracts and emphasized both his track record and his partnership with the Global Investment Bank.

d. Before leaving JARAMILLO's Office, Victim Investor-3 agreed to invest $30,000 and executed a contract pursuant to which JARAMILLO promised Victim Investor-3 a twenty-five percent return after ninety days.

e. Shortly thereafter, JARAMILLO told Victim Investor-3 that his investment was performing well and encouraged him to re-invest in a new commodities contract. JARAMILLO also encouraged Victim Investor-3 to invest more, representing that if Victim Investor-3 had a total investment of $250,000, the entire investment would become protected by federal insurance. Victim Investor-3 pooled money from friends and family to reach $250,000.

f. When Victim Investor-3 subsequently sought to redeem his investment, JARAMILLO failed to pay. As with Victim Investor-1 and -2, JARAMILLO blamed the Global Investment Bank. Since the fall of 2016, Victim Investor-3 has been working to repay the friends and family who provided him with funds to invest with JARAMILLO.

### Victim Investor-4

a. Victim Investor-4 is a seventy-five-year-old dual citizen of the United States and Colombia who, until the fall of 2016, resided in Queens, New York.

b. In or about the summer of 2015, Victim Investor-4 visited a community center to obtain advice concerning a landlord-tenant dispute. While there, Victim Investor-4 met an individual not named herein ("Individual-3") who was giving a presentation regarding investment opportunities.

c. Shortly thereafter, Individual-3 took Victim Investor-4 to meet JARAMILLO at his office in the Wall Street Building.

d. At this meeting, JARAMILLO made representations similar to those he made to the investors described above, including JARAMILLO's positive investment track record, the proffered high rate of return on a short-term investment, and the purported benefits of JARAMILLO's relationship with the Global Investment Bank.

e. JARAMILLO further told Victim Investor-4 that he could help Victim Investor-4 earn enough money to purchase a small apartment in Colombia where Victim Investor-4 hoped to retire.

f. Before leaving the meeting, Victim Investor-4 wrote JARAMILLO a check for $25,000, a substantial portion of her savings, and signed a contract pursuant to which her money was to be invested in commodities and earn a twenty-five percent return in ninety days.

g. Approximately two months later, Victim Investor-4 notified JARAMILLO that she had identified an apartment in Colombia and wanted to use the proceeds from her investment with JARAMILLO to fund its purchase.

h. Instead of returning Victim Investor-4's money, as he was obligated to do, JARAMILLO told Victim Investor-4 that he would secure a $180,000 loan to fund the purchase of the apartment in Colombia. Based on this representation, Victim Investor-4 signed a contract on the apartment and used a portion of her remaining savings on the down payment. When the loan never materialized, Victim Investor-4 lost her down payment.

i. When confronted by Victim Investor-4, JARAMILLO apologized, claimed he had been hospitalized, and assured Victim Investor-4 that her investment was safe. Thereafter, JARAMILLO convinced Victim Investor-4 to invest more. By May 2016, Victim Investor-4 invested an additional $38,500, the remainder of her life savings, as well as $50,000 her children had given her to help fund the purchase of an apartment.

j. In connection with these investments, JARAMILLO asked to receive the money by wire transfer. When Victim Investor-4 responded that she did not know how to send a wire transfer,

JARAMILLO personally accompanied Victim Investor-4 to her bank to facilitate the transfers.

  k. In the fall of 2016, Victim Investor-4 met with JARAMILLO to beg him to return her money. JARAMILLO instructed Victim Investor-4 to sign certain documents which, according to JARAMILLO, would facilitate the return at least $80,000. Victim Investor-1 signed the documents but did not receive her money.[2]

  l. In the summer of 2016, Victim Investor-4 was evicted from her apartment. As recently as October 2016, JARAMILLO assured Victim-4, orally and in writing, that her money was safe and, in fact, had grown to approximately $180,000.

### Other Victims

  13. Based on my interviews of other victim investors of PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, my review of documents provided by certain of those victims, and my review of transactions in the Jaramillo Accounts, as described below, I have identified at least two dozen victim investors who wired money to one of the Jaramillo Accounts for purported investments with JARAMILLO (the "Other Victim Investors").

  14. As with the Victim Investors, I have learned that the Other Victim Investors invested based on representations by PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, including, among other representations, the following: (a) JARAMILLO had a positive investing track record; (b) JARAMILLO would establish individual investor accounts; (c) investor monies would be invested in commodities; (d) JARAMILLO's relationship with the Global Investment Bank.

### The Global Investment Bank

  15. As part of my investigation, I have communicated with and requested records from the Global Investment Bank concerning accounts or transactions involve PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, or any of the JARAMILLO entities. Based on these communications, I have learned, among other things, that the bank has no record of doing any business with JARAMILLO or the Jaramillo Entities.

### Jaramillo Misappropriates the Majority of Investor Funds

  16. Based on my review of records for the Jaramillo Accounts

---

[2] To date, Victim Investor-4 has received just $8,000 back from JARAMILLO.

10

for January 2014 through October 2016, I have learned, among other things, the following:

        a. There is no evidence that PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, used investor monies to make investments in commodity futures contracts or for any legitimate investment purpose.

        b. Instead, JARAMILLO misappropriated the majority of the money raised from investors for his personal use. In total, of the more than $1.2 million in investor funds, JARAMILLO diverted more than $700,000 to himself in the form of cash withdrawals and debit card purchases. For example, on at least three occasions in 2015 and 2016, JARAMILLO flew members of his family and guests to Disney World where they spent thousands of dollars on luxury hotel accommodations, restaurants, retail purchases and amusement at the resort.

        c. In addition, to keep his fraudulent scheme from being uncovered, JARAMILLO used new investor funds to pay back certain investors in a Ponzi-like fashion. In total, of the more than $1.2 million in investor funds received by JARAMILLO, more than $200,000 was used, not to buy commodities or make other investments, but to repay investors whose redemptions could not be forestalled. For example, on or about March 30, 2016, Victim Investor-4 wired $19,500 to one of the Jaramillo Accounts. None of this money was used for investments. Instead, later the same day, $7,000 was wired to a different investor.

        d. JARAMILLO also wired more than $100,000 of investor funds offshore, including to bank accounts in Peru, of which JARAMILLO is a citizen. For example, on or about December 7, 2015, after one of the JARAMILLO accounts received $80,000 in monies from two victim investors, JARAMILLO wired $25,000 to an account in Peru.

        e. As of the end of October 2016, the Jaramillo Accounts all had a near-zero, zero, or negative balance.

### Jaramillo's Plans to Return to Peru

    17. Based on my communications with certain victim investors, I have learned that as of December 2016, PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, has stopped returning calls and emails from investors, notwithstanding threats from certain investors to report him to the criminal authorities. Also in December 2016, victim investors have learned from certain of JARAMILLO's associates that JARAMILLO is planning to move back

11

to Peru.

18. Based on this information, as well as on the wire transfers to Peru, and the fact that hundreds of thousands of dollars in investor money was withdrawn in cash by JARAMILLO and remains unaccounted for, I believe that JARAMILLO is planning to leave the United States and return to Peru.

WHEREFORE, I respectfully request that an arrest warrant be issued for PEDRO JARAMILLO, a/k/a "Enrique Jaramillo," the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

ALEXANDER H. KURGANKSY
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
19th day of December, 2016

HONORABLE RONAL L. ELLIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK